UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

MICHAEL T. HAYES,

                    Plaintiff,

        v.

CORRECTIONS CORPORATION OF
AMERICA (CCA), et al.,

                    Defendants.

Case No. 1:09-cv-00122-S-BLW

**MEMORANDUM DECISION AND
ORDER**

Pending before the Court are several non-dispositive motions ripe for adjudication in this prisoner civil rights case (Dkts. 91, 92, 95, 97, 100), as well as Defendants' Second Amended Motion for Summary Judgment (Dkt. 101), and Plaintiff's Motion to File a Second Amended Complaint. (Dkt. 109.) The Court finds that the decisional process would not be aided by oral argument. After reviewing the record and the arguments of the parties, the Court enters the following Order addressing all pending motions.

**BACKGROUND**

Plaintiff Michael T. Hayes (Plaintiff) is currently an Idaho Department of Correction (IDOC) inmate, bringing conditions of confinement causes of action arising from his incarceration at the Idaho Correctional Center (ICC), a private prison operated by the Corrections Corporation of America (CCA), where he was housed between 2004 and 2007. On April 14, 2007, Plaintiff was beaten and robbed by two other ICC inmates.

Plaintiff alleges that, before the assault, he had filed offender concern forms with prison staff, asking to be transferred to a different pod because he feared for his safety. ICC staff allegedly did not receive those requests. Following the assault, Plaintiff was treated for his injuries and later transferred to a different pod where he was "largely free of these kind of assaults." (Dkt. 7, p.12.)

Plaintiff filed his original Complaint in this civil rights action on March 16, 2009, asserting that ICC Defendants[1] failed to protect him from other inmates who had assaulted him. (Dkt. 1.) Because several other ICC inmates had filed similar claims, the Court initially consolidated all the cases for purposes of pre-answer mediation under Lead Case No. 1:08-cv-00402-BLW, *Hoak v. IDOC Warden Smith, et al.* However, in November 2009, the Court dismissed without prejudice all but Plaintiff Hayes' case because each of the other plaintiffs had failed to exhaust their administrative remedies before bringing suit. (Dkt. 6.) Plaintiff's case was then deconsolidated and he was further ordered to proceed on his First Amended Complaint (Dkt. 7) under its own case number 1:09-CV-122-BLW.

Several claims in the First Amended Complaint are subject to dismissal based on prior Orders. Plaintiff's fifth claim alleges Defendant Archibald failed to properly conduct the investigation following Plaintiff's assault. However, the Court dismissed Defendant Archibald from this case in the Initial Review Order because there is no

---

[1]The terms "Defendants" or "ICC Defendants" referenced herein refer to the defendants CCA, John Ferguson, Phillip Valdez, Dan Prado, Brian Doser, Justin Acosta, Brandon Delaney, and John/Jane Does, (Members of SMU Placement Committee).

**MEMORANDUM DECISION AND ORDER - 2**

constitutional right to have one's prison assault investigated. (Dkt. 3, pp. 5-6.) Although the Initial Review Order was entered by U.S. Magistrate Judge Bush, this Court has reviewed the Initial Review Order and adopts it in its entirety. As a result, the fifth claim is no longer part of this lawsuit and will be dismissed with prejudice.

Plaintiff did not properly or timely served Defendants Garett, Bajovich and Stanger, who allegedly failed to render proper medical treatment after Plaintiff's assault. (Dkt. 7, p.16.) Therefore, in a previous Order the Court ruled that Plaintiff could no longer "proceed with claims against these Defendants in this lawsuit." (Dkt. 50, p.5.) Accordingly, Plaintiff's sixth claim is no longer part of this lawsuit and will be dismissed with prejudice.

In the nearly three years since Plaintiff was ordered to proceed on his own Complaint, numerous pretrial motions and discovery disputes have been filed, argued and resolved in this case. In January 2012, the parties attended a Settlement Conference before Judge Mikel H. Williams but failed to reach a settlement. (Dkt. 88.) Thereafter, the Court ordered all remaining discovery to be completed by February 29, 2012, and all motions for summary judgment to be filed on or before March 30, 2012. (Dkt. 90.)

The parties then filed the following motions that are now pending before the Court: (**1**) Plaintiff's Motion for Trial Date (Dkt. 91); (**2**) Plaintiff's Motion for Res Judicata Collateral Estoppel and/or Issue Preclusion (Dkt. 92); (**3**) Plaintiff's Motion for Subpoena Time Enlargement (Dkt. 95); (**4**) Plaintiff's Motion for Subpoenas Duces Tecum (Dkt. 97); (**5**) ICC Defendants' Motion to Strike Affidavits of Larry Sittner,

Brandon Jordan, Todd Butters, Phillip Fenwick, and Albert Veenstra Filed in Support of

Plaintiff's Motion for Subpoenas Duces Tecum (Dkt. 100); **(6)** ICC Defendants'

Amended Second Motion for Summary Judgment (Dkt. 101); and **(7)** Plaintiff's Motion

for Leave of Court to File Second Amended Civil Rights Complaint Pursuant to F.R.C.P.

Rule 15.A (Dkt. 109.)

The Court will first address the only pending dispositive motion–Defendants'

Amended Second Motion for Summary Judgment–wherein Defendants assert entitlement

to summary judgment on all of Plaintiff's claims in the First Amended Complaint on the

grounds of res judicata and failure to show an Eighth Amendment violation.  The Court

will then address Plaintiff's Motion for Leave to Amend Complaint, followed by the

parties' remaining five nondispositive motions.

## DEFENDANTS' SECOND AMENDED
## MOTION FOR SUMMARY JUDGMENT

### 1.    Standard of Law for Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

**MEMORANDUM DECISION AND ORDER - 4**

unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any *material* fact. "Material facts are those that may affect the outcome of the case." *See id.* at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence

**MEMORANDUM DECISION AND ORDER - 5**

must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Nor is the Court "required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Fosberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

However, in civil rights cases the Ninth Circuit has held that the procedural requirements applied to ordinary litigants at summary judgment do not apply as stringently to prisoner pro se litigants. In *Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010), district courts were reminded to "construe liberally motion papers and pleadings filed by pro se inmates and ... avoid applying summary judgment rules strictly." *Id.* at 1150. The Ninth Circuit also has observed that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.2003)

**MEMORANDUM DECISION AND ORDER - 6**

(evidence which could be made admissible at trial may be considered on summary judgment); *see also Aholelei v. Hawaii Dept. of Public Safety*, 220 Fed. Appx. 670, * 1 (9th Cir.2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prison and letters from other prisoners" which evidence could be made admissible at trial through the other inmates' testimony at trial). Once the Court considers all the evidence presented by the parties, Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials– including the facts considered undisputed–show that the movant is entitled to it."

## 2.    Material Facts

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record.

Plaintiff is an inmate under the jurisdiction of IDOC. Beginning in April 2004, Plaintiff was incarcerated at ICC, a private prison operated by CCA.[2] (Dkt. 101-1, pp.1-2.) During the first three years of his incarceration, Plaintiff was placed in the SMU on

---

[2]The ICC houses inmates in 6 different Units and within these Units are a number of Pods designated by letters of the alphabet. The North Wing Units have 3 Pods each: ABC, DEF, GHI and JKL. The West Wing Units have 6 Pods each: M through R and S through X. There is also a separate Unit for administrative and disciplinary segregation, known as the Special Management Unit (SMU). (Dkt. 7, p.8.)

**MEMORANDUM DECISION AND ORDER - 7**

four different occasions because of behavioral problems and/or failure to comply with prison rules. (Dkt. 101-1, p.2.)

On September 29, 2006, Plaintiff was released from SMU and assigned to A-Pod. That same day, Plaintiff submitted a written request for protective custody and alleged that another inmate told him "I could not stay on A Pod because I was a sex offender. I was told I had to leave right away." (Dkt. 101-11, p.4.) In the request Plaintiff stated that he did not know the threatening inmate's name, but described him as being "a bald man with 2 teardrop tatoos on his face just below one eye." (sic) (Dkt. 101-11, p.4) Plaintiff refused to remain in A-Pod so he was placed in SMU pending the outcome of his request for protective custody. (Dkt. 101-11, p.8.)

On October 5, 2006, Defendants Doser and Acosta interviewed Plaintiff about his request for protective custody. (Dkt. 101-11, pp. 3-4.) Defendants Doser and Acosta said that "Plaintiff then told us that the inmate who threatened him was named "Pierce," but failed to give any further details." (Dkts. 101-6, p.3, 101-7, p.3.) Defendants state in their written report that they described the qualifications for placement into segregation and when they told Plaintiff he was not a likely candidate, "[Plaintiff] became disrespectful towards us. He then began to give us evidence in his case that would indicate he is a wrongfully convicted felon. [We] told him to stop talking about his court case, and that we were there for a protective custody hearing. The inmate then remained silent for the rest of the interview. He refused to answer our questions." (Dkt. 101-11, p. 3.)

**MEMORANDUM DECISION AND ORDER - 8**

However, Plaintiff alleges that Defendants Doser and Acosta asked Plaintiff, "Why should we put you in protective custody when you held down an underaged or a teenage girl and shot her up full of some unknown drugs and gave her Hepatitis C which is a uncureable diease that she will have for life? (sic)." (Dkt. 103-3, p.6.) Plaintiff further alleges that he responded by saying: "I did not do what the State alleged I did. Besides, what does that have to do with my life, here, inside this institution, when I have told you, that my well being is in jeopardy." (Dkt. 97-2, p.5.)

Doser submitted the written report about the interview to the Segregation Housing Committee and concluded that "Plaintiff is not a candidate for placement into protective custody. He should be placed in K or L pod. His refusal to cooperate is an indicator that he is not legitimately in fear of any inmate. The information he provided does not merit the placement of an inmate into segregation." (Dkt. 101-11, p.3.) Plaintiff contends that "Unit Manager Brian Doser and Case Manager Justin Acosta denied me protective custody, because of some lies they read in my trial transcript." (Dkt. 103-3, p.7.)

On October 11, 2006, ICC Segregation Housing Placement Committee[3] conducted a protective custody hearing and heard testimony from Plaintiff and ICC staff. (Dkt. 101-1, p.4.) After the hearing the Committee unanimously recommended Plaintiff be returned to the general population in the "L or K-Pod, bottom bunk bottom tier." (Dkt. 101-11, p.5.) The Committee members determined that Plaintiff's lack of cooperation in the

---

[3]The Committee included Defendants Dan Prado, Brian Delaney, and April Chapman. (Dkt. 101-1, p.4.)

**MEMORANDUM DECISION AND ORDER - 9**

investigation and the lack of corroborating evidence of Plaintiff's allegations did not warrant placement into protective custody. (Dkts. 101-4, p.2, 101-8, p.2.) Defendant Valdez, the ICC Warden, approved the decision. (Dkt. 101-11, p.5.) Plaintiff was transferred to K-Pod that same day. (Dkt. 101-11, p.23.)

Three months later, on January 17, 2007, Plaintiff was temporarily transferred from K-Pod to the Medical Unit, and when he returned to the general population on January 19, 2007, he was placed in A-Pod. (Dkt. 101-11, p.23.) Two days later, Plaintiff alleged he had been threatened with immediate physical harm by an unnamed inmate if he was not moved from A-Pod that day. (Dkt. 101-1, p.5.) Plaintiff personally informed ICC staff about the threat and he was transferred from A-Pod back to K-Pod. (*Id.*) Plaintiff allegedly filed a written ICC inmate concern form on that same day–January 21, 2007– to Defendant Doser, reiterating his concern for his personal safety. (Dkt. 7-2, p.9.) Defendant Doser does not recall receiving the concern form.[4] (Dkt. 101-6, p.4.) On March 20, 2007, and April 2, 2007, Plaintiff allegedly filed two more concern forms requesting a transfer from K-Pod "for my own saftey (sic) and protection" because of problems with other inmates due to "my alledged charges of L+L (sic)," and that a white supremacy group was "going to try and start charging me rent." (Dkt. 7-2, Ex. 10.) Plaintiff did not

---

[4]Defendant Doser states in his Affidavit that at the time Plaintiff allegedly submitted his concern forms, "there was no tracking system for when an inmate would submit a concern form for staff to review. While the concern forms were generated in triplicate carbon copies, it was my experience that inmates on occasion, would fill out the concern form and destroy the other copies, thus alleging that the concern had never been answered. Inmates would then be able to expedite the grievance process." (Dkt. 101-6, p.4.)

**MEMORANDUM DECISION AND ORDER - 10**

identify the names of any particular inmates, nor did he specifically state he had been

threatened with any physical harm beyond the more generalized statement that he was

"starting to have problems with other inmates." *Id.* Defendants state that ICC staff never

received the two concern forms filed by Plaintiff (Dkt. 101-1, p.5), and that "ICC staff

had received no concern forms or other reports, or knew of any incidents that would have

corroborated [Plaintiff's] alleged statements that other inmates were being extorted." (*Id.*)

On April 14, 2007, Plaintiff was assaulted in K-Pod by Inmates Timothy Bushnell

and Jonathan Mcelfish. (Dkt. 97-1, p.1.) According to prison records, these inmates went

into Plaintiff's cell and "assaulted him with a lock in their hand as a weapon. They told

him they wanted him to pay rent and he refused. As they assaulted him, they also robbed

him of his commissary . . . ." (*Id.*) Plaintiff left his cell and "attempted to get the attention

of Officers," but the assault continued, eventually ending with inmate Timothy Bushnell

"knocking [Plaintiff] down to the floor and kicking him continually until he appeared to

go unconscious. [Plaintiff] then got up and attempted to exit the pod by pushing the call

button at the pod door. The pod was locked down and a code blue called because of the

assault." *(Id.)*

After the assault, ICC medical staff evaluated Plaintiff's injuries. (Dkt. 101-3, Ex.

B p.17.) One of the nurses filled out the Facility Emergency Anatomical Form indicating

he had "erythema [redness of the skin]" on his left side and mid-back, "three red

scratches" to his left chest, "slight bruising" to areas on his right side of neck/clavicle area

with three "red scratches", "superficial abrasions" to his elbows, a one inch "red scratch" to his external right eye, and "slight edema, redness" and a "small" "superficial cut" to his left temple. (*Id.* at 30.) The nurse who treated Plaintiff summarized his injuries as "multiple areas of mild redness at various... sites on his body. The worst of his injuries was an area of mild edema & bruising to [left] side of his face." (*Id.* at 17.)

After ICC medical staff evaluated Plaintiff's injuries, he was placed in SMU for two days. (Dkt. 97-2, p.7.)[5] ICC staff promptly investigated the assault which included an interview with Plaintiff. (Dkt.101-3, Ex. B pp.5-21.) ICC staff conducted cell and body searches, including "knuckle checks" (*Id.* at 5) and another staff member reviewed the security cameras. (*Id.* at 22.) ICC gathered written statements from the inmates involved in the assault, as well as from eleven ICC employees, and compiled an investigation report. (*Id.* at 22-23.) Inmates Bushnell and Mcelfish were issued Disciplinary Offense Reports (DOR) for their aggravated assault upon Plaintiff and placed in SMU for 10 days. (*Id.*) ICC also sent a report to the Ada County Sheriff's Department for its consideration of pursuing additional criminal charges. (*Id.* at 35.) Plaintiff was then transferred out of SMU to X-Pod following the assault, and since that time has not "suffered any further

---

[5]Over the next three weeks, Plaintiff alleges he submitted three separate Health Services Request (HSR) forms requesting pain medication for the injuries he sustained in the assault. (Dkt. 103-5, p.8.) On April 20, 2007, ICC medical staff prescribed Plaintiff a 90 day supply of the pain reliever Naproxen, and on April 30, 2007, Plaintiff was also prescribed a seven day supply of Robaxin, a drug used to relieve muscle pain and discomfort, and Prednisone, a drug used to reduce inflammation. (Dkt. 19, p.12.) Plaintiff further alleges that his dental bridge was significantly damaged in the assault, and that it needs to be replaced but ICC dental staff refused to do so. (Dkt. 103-5, pp.8-9.) Defendants claim that per ICC policy, inmate dental bridges are not to be fabricated. (Dkt. 103-7, p.5.)

**MEMORANDUM DECISION AND ORDER - 12**

physical confrontations with other inmates." (Dkt. 101-3, p.3.)

In the year prior to Plaintiff's assult, a total of 67 other ICC incident reports were filed regarding inmate-on-inmate assaults (Dkt. 101-3, Ex. A.) Plaintiff's assault was incident number 68. Prior to Plaintiff's assault, Defendants report that six (or 9%) of the assault victims were targeted because they were sex offender inmates. (Dkt. 101-2, pp.7-8.) Plaintiff alleges that ICC staff "failed to adequately investigate prisoner beatings and robbery's (sic). J.K.L. and A.B.C became known to inmates as Gladeator-Pods (sic). Well known to inmates in all ICC cell areas."[6] (Dkt. 103-3, p.8.)

## 3.      Res Judicata and Collateral Estoppel

### A.      *Standard of Law*

Res judicata prevents parties from re-litigating causes of action which were finally decided in a previous suit. Res judicata is an affirmative defense which may be used by a defendant in federal court to give preclusive effect to prior state court judgments. *See* 28 U.S.C. § 1738 (federal courts must afford full faith and credit to state judicial proceedings); *Allen v. McCurry*, 449 U.S. 90 (1980) (federal courts hearing § 1983 actions must give *collateral estoppel* preclusive effect to state court judgments); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75 (1984) (federal courts hearing § 1983

---

[6] Plaintiff makes similar allegations in his First Amended Complaint: "[I]t is also known amongst staff and offenders that if a offender is placed in Units JKA you will be forced to show your paperwork stating what your crime is. If you fail to show your paperwork or are known by the offenders to be a rat or sex offender you will be told by the offenders to go and tell staff that you need to be moved. If you fail to do as the offenders have requested then you are subjected to being assaulted and robbed. Staff are fully aware of this problem yet still place sex offenders in harms way deliberately." (Dkt. 7, pp. 14-15.)

**MEMORANDUM DECISION AND ORDER - 13**

actions must give *res judicata* preclusive effect to state court judgments). To determine whether a state judgment should have preclusive effect in a federal action, federal courts apply the state's rules governing preclusion. *See Migra*, 465 U.S. at 83-85.

Under Idaho law, the party asserting res judicata as an affirmative defense bears the burden of establishing all of the essential elements thereof by a preponderance of the evidence. *Foster v. City of St. Anthony*, 841 P.2d 413, 420 (Idaho 1992). "Under the principle of res judicata or claim preclusion, judgment on the merits in a prior proceeding generally bars relitigation between the same parties or their privies on the same cause of action." *D.A.R., Inc., v. Sheffer*, 997 P.2d 602, 605 (Idaho 2000) (citing *Yoakum v. Hartford Fire Ins.*, 923 P.2d 416 (Idaho 1996)).

A party seeking to apply collateral estoppel (or issue preclusion) must show the following: (1) the party against whom an earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation. *Ticor Title Co. v. Stanion*, 157 P.3d 613, 618 (Idaho 2007).

**B.**     *Discussion*

Defendants seek to impose a res judicata or collateral estoppel effect from Plaintiff's prior state habeas corpus action in this federal civil rights action. The primary

**MEMORANDUM DECISION AND ORDER - 14**

issue is that an Idaho habeas corpus action is a unique state law cause of action based upon the Idaho Constitution and an Idaho statute. While a state habeas corpus action may involve federal constitutional issues, there is ordinarily no right to discovery, no availability of jury trial, and no availability of a remedy other than injunctive relief. *See* Idaho Code §§ 19-4209 & -4210. Here, Plaintiff was not permitted discovery prior to the dismissal of his case; in addition, he could not pursue damages in a state habeas corpus action.[7] *Cf. Hawkins v. Risley*, 984 F.2d 321, 325 (9th Cir. 1993) (res judicata properly applied where "the state court allowed Hawkins to submit briefs, present evidence, and cross-examine the state's witnesses").

The standard of law used in a state habeas corpus action is distinctly different from a § 1983 action. This difference calls into question the party's ability to fully and fairly litigate a claim. In his state habeas corpus action, Plaintiff was required to meet the standard specified in Idaho Code § 19-4211,[8] which is akin to the standard for a

---

[7] *See* www.idcourts.us/repository.

[8] Idaho Code § 19-4211(2) provides:

Any court authorized under section 19-4202, Idaho Code, may grant a writ of habeas corpus and order a hearing pursuant to a petition filed by a prisoner, or, pursuant to section 19-4207, Idaho Code, on behalf of a prisoner when:

(a) The court has considered the factual allegations contained in the petition together with any responsive pleading filed by the respondent, and a reply filed by the prisoner, if any;

(b) The court finds that the petitioner is likely to prevail on the merits of his state or federal constitutional challenge;

(c) The court finds that the petitioner will suffer irreparable injury if some relief is not granted;

**MEMORANDUM DECISION AND ORDER - 15**

preliminary injunction, and far from the preponderance of evidence standard in a civil rights action for damages.

Because of these significant differences between a state habeas corpus action and a federal civil rights action, the Court concludes that Plaintiff did not have an opportunity to fully and fairly litigate his constitutional claims and issues in state court and that the claims were not identical. As a result, that portion of Defendants' Motion for Summary Judgment is denied.

**4.      Failure to Protect Claims**

**A.      *Standard of Law***

Here, Plaintiff sues Defendants, who are a private corporation and its employees, for failure to protect him under the Eighth Amendment. To prevail on a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d at 1420. In *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), the court outlined the requirements for a finding of proximate causation:

> Liability under section 1983 arises only upon a showing of personal participation by the defendant. *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.1979). A supervisor is only liable for constitutional violations of his

----

(d) The court finds that the balance of potential harm to the petitioner substantially outweighs any legitimate governmental interest; and

(e) The court finds that equity favors granting relief to the petitioner.

**MEMORANDUM DECISION AND ORDER - 16**

> subordinates if the supervisor participated in or directed the violations, or
> knew of the violations and failed to act to prevent them. There is no
> respondeat superior liability under section 1983.

*See also Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) ("The law clearly allows

actions against supervisors under section 1983 as long as a sufficient causal connection is

present and the plaintiff was deprived under color of law of a federally secured right."

(quoting *Redman v. County of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)).

Moreover, to bring a § 1983 claim against a municipality (local governmental

entity) or a private entity performing a government function, a plaintiff must allege that

the execution of an official policy or unofficial custom inflicted the injury of which the

plaintiff complains. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694 (1978).[9]

That is, "a municipality [or entity] can be found liable under § 1983 only where the

municipality [or entity]  itself causes the constitutional violation at issue." *City of Canton*

*v. Harris*, 489 U.S. 378, 385 (1989).

Requisite elements of a § 1983 policy-based claim against a municipality or entity

are the following: (1) the plaintiff was deprived of a constitutional right; (2) the

---

[9]All United States Courts of Appeal addressing this issue have determined that the *Monell* rule applies to bar respondeat superior liability where defendants are private entities performing state functions. *See, e.g., Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992); *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408–09 (2d Cir. 1990). *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Powell v. Shopko Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

**MEMORANDUM DECISION AND ORDER - 17**

municipality or entity had a policy;[10] (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir.1996) (internal quotation marks omitted)).  Furthermore, all policy-based claims must meet the pleading standards clarified by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That is, mere "formulaic recitation of a cause of action's elements" is insufficient. *Twombly*, 550 U.S. at 555. Stated another way, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

To prevail on an Eighth Amendment "prison conditions" claim based on failure to prevent harm, the inmate must satisfy two requirements. First, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This is the "objective" element of the test. *Id*. In addition, the inmate must show that prison officials were deliberately indifferent to a substantial risk of serious harm, which is the "subjective" element of the test. *Id.* at 837. Deliberate indifference exists when an official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and actually draws such an

---

[10] "An official municipal policy" may include "decisions of a government's lawmakers, the acts of its policymaking officials, [or] practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).

**MEMORANDUM DECISION AND ORDER - 18**

inference. *Id.; Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010).

As to the objective element of the Eighth Amendment inquiry, the plaintiff must allege a "sufficiently serious" deprivation. *Farmer*, 511 U.S. at 834. While a mere threat does not establish a constitutional wrong, *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987), an inmate seeking a remedy for unsafe conditions need not "await a tragic event such as an actual assault before obtaining relief." *Chandler v. Williams*, 2010 WL 6004373 *9 (D. Or. 2010) (quoting *Farmer*, 511 U.S. at 845). A threat combined with an opportunity to carry out the threat, however, does state an Eighth Amendment claim. *Id.* (citations omitted).

Regarding the subjective element of an Eighth Amendment claim, the Ninth Circuit has explained that a showing that a prison official had a "sufficiently culpable state of mind" under *Farmer* "entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005) (citing *Farmer*, 511 U.S. at 835). In *Hearns*, where a "series of planned attacks and religious-related violence" by the ruling Muslim group against other Muslims at the prison was "'longstanding, pervasive, [and] well-documented,'" the court held that the allegations in the complaint "were sufficient to raise an inference that the prison officials acted with deliberate indifference, or knew that Hearns faced a substantial risk of serious harm and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'"

**MEMORANDUM DECISION AND ORDER - 19**

*Hearns*, 413 F.3d at 1041-42 (quoting *Farmer*, 511 U.S. at 847). *Hearns* is instructive,

but not procedurally on point because the issue there was whether the allegations of the

complaint failed to state a claim, and, here, the issue is whether Plaintiff has sufficient

admissible evidence to rebut Defendants' argument that no facts showing deliberate

indifference exist.

In *Berg v. Kincheloe*, 794 F.2d 457 (9th Cir. 1986), the Court explained

the subjective element of the test:

> The standard does not require that the guard or official believe to a
> moral certainty that one inmate intends to attack another at a given place at
> a time certain before that officer is obligated to take steps to prevent such an
> assault. But, on the other hand, he must have more than a mere suspicion
> that an attack will occur.

 *Id*. at 459 (internal punctuation and citation omitted); *see also Glenn v. Berndt*, 289

F.Supp.2d 1120, 1124 (D.C. Cal. 2003). Prison officials might avoid a finding of

deliberate indifference if they show, for example,

> that they did not know of the underlying facts indicating a sufficiently
> substantial danger and that they were therefore unaware of a danger, or that
> they knew the underlying facts but believed (albeit unsoundly) that the risk
> to which the facts gave rise was insubstantial or nonexistent.

*Magnan v. Runnels,* 2010 WL 3768148 *4 (E.D. Cal. 2010) (quoting *Farmer*, 511 U.S. at

844).

**B.    *Discussion of Plaintiff's First and Fourth Claims***

Plaintiff's first and fourth claims allege that the ICC Defendants violated

Plaintiff's Eighth Amendment rights by placing him on top tier, top bunk locations in A-

**MEMORANDUM DECISION AND ORDER - 20**

Pod and SMU, even though he had a medical memo restricting his housing placement to a lower bunk on a bottom tier. (Dkt. 7, pp.10, 15-16.) The Court has reviewed the evidence submitted in this case, and finds that Plaintiff has failed to establish any damage or injury that resulted from his top-tier, top-bunk housing assignments.

Plaintiff's alleged injuries are a result of the inmate assault on April 14, 2007. Plaintiff makes no argument, nor has the Court found any evidence, that a bottom-tier, bottom-bunk housing assignment would have prevented such attack and/or the resulting injuries. Indeed, ICC's protective custody hearing report recommends that Plaintiff be moved to "L or K-Pod bottom bunk bottom tier" (Dkt. 7-2, p.7.) From this recommendation the Court infers that any threat of or actual attack upon Plaintiff would have occurred anywhere in the so-called L or K "Gladiator Pods," regardless of a top-tier, bottom-tier, top-bunk or bottom-bunk assignment. Defendants argue, and the Court agrees, that these "medical conditions" and the Plaintiff's claim that "ICC staff were deliberately indifferent to his medical needs" are irrelevant to Plaintiff's failure-to-protect claims. (Dkt. 105, p.4.) Because there is no showing of injury resulting from these bunk and tier assignments, this allegation fails as an element of a failure-to-protect claim or as a stand-alone civil rights medical care claim,  Accordingly, Plaintiff's first and fourth claims will be dismissed with prejudice.

**MEMORANDUM DECISION AND ORDER - 21**

### C.   *Discussion of Plaintiff's Second, Third, and Seventh Claims*

Plaintiff's second, third, and seventh claims allege that Defendants Valdez, Prado, Doser, Acosta, Delaney and Chapman failed to protect him by placing him in a dangerous unit for sexual offenders and refusing to transfer him. (Dkt. 7, pp.14-15.)[11] Based on the *Farmer v. Brennan* standard, above, the Court will first review the objective component of Plaintiff's failure-to-protect claim, and then the subjective component.

### (1)   Objective Requirement: Substantial Risk of Serious Harm

Plaintiff satisfies the objective requirement for a failure-to-protect claim if he shows that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. Plaintiff alleges that ICC housing pods ABC and JKL have "notorious reputations for assaults against inmates who have been convicted of sex crimes." (Dkt. 97-2, p.3.) These pods are known to all ICC inmates as "Gladiator Pods" (Dkt. 103-3 p.8), and that if a sex offender inmate is assigned to one of these pods, "you will be forced to show your paperwork stating what your crime is. If you fail to show your paperwork or are known by the offenders to be a rat or sex offender you will be told by the offenders to go and tell staff that you need to be moved. If you fail to do as the offenders have requested then you are subjected to being assaulted and robbed. Staff are fully aware of this problem yet still place sex offenders in harms way deliberately." (Dkt.

---

[11]For purposes of this Summary Judgment Motion, the Court substitutes Defendant April Chapman as a "Jane Doe" defendant in the First Amended Complaint, because Plaintiff did not know her identity at the time he filed the First Amended Complaint, but has moved to substitute her as a defendant.

7, pp.14-15.)

Plaintiff further alleges that between September 2006 and April 2007, he was threatened four separate times by inmates because of his status as a sex offender - twice while assigned housing in A-Pod, and twice while living in K-Pod. Plaintiff allegedly informed ICC staff about these threats verbally and/or in writing. (Dkts. 103-3, p.5, 103-4, p.6, 7-2, pp.9-10.) Plaintiff alleges in his written request for protective custody and three inmate concern forms that he was told "to leave right away" (Dkt. 103-4, p.6), that he was concerned for his "own safety and protection" (Dkt. 7-2, p.10), and that white supremacist gangs were going to start charging him "rent." *Id.* Less than two weeks after he allegedly submitted his fourth inmate concern form, Plaintiff was assaulted by two white supremacist gang members who also stole commissary items from his cell. (Dkt.103-2, p.1.)

As part of pretrial discovery, the Court ordered Defendants to produce documents related to all inmate-on-inmate assaults at ICC between April 14, 2006 and April 14, 2007. (Dkt. 69, p.6.) Excluding Plaintiff's assault, there were 67 incident reports generated for all inmate-to-inmate assaults. (Dkt. 101-1, p.7.) Defendants argue that these inmate-on-inmate assault reports show: 1) that in the year prior to Plaintiff's assault, there had been only one other assault on K-Pod in which a victim was both extorted from and attacked because he was a sex offender and that such assault happened six months before Plaintiff's assault (Dkt. 101-1, p.8); 2) there were only six assaults throughout the entire

**MEMORANDUM DECISION AND ORDER - 23**

ICC facility that occurred where the victim was targeted because he was a sex offender

(or 9% of the total assaults in that time period) (Dkt. 101-2, p.8); and 3) the statistical

evidence from these assault reports does not support Plaintiff's argument that ICC failed

to protect sex offenders from disproportionally higher assaults than other inmates in the

ABC or JKL Pods. (Dkt. 101-2, p.9.) Defendants conclude that the lack of similar events

in these assault reports imply that there are no facts that would permit a reasonable

factfinder to infer that the prisoner was incarcerated under conditions that posed a

substantial risk of serious harm.

Defendants also argue that Plaintiff's history at ICC did not suggest that he was a

vulnerable inmate or that he personally faced a substantial risk of harm. *Farmer*, 511 U.S.

at 834-35. Defendants point out that Plaintiff had no history as a vulnerable inmate during

his first three years of incarceration (Dkt. 101-1, p.2.) In addition, because Plaintiff lived

on K-Pod for the majority of time between October 2006 and April 2007, "mostly without

incident" (Dkt. 101-2, p.10), "there was no indication that [Plaintiff] specifically would

have been a target on K-Pod." *Id.* Finally, Defendants question the timing and validity of

Plaintiff's initial complaint of being threatened by another inmate because of his status as

a sex offender. In September 2006, Plaintiff was transferred from SMU to P-Pod,

whereupon Plaintiff allegedly refused to move because of the size and location of the cell,

so he was transferred back to SMU. (Dkt. 101-1, p.3.) Ten days later, Plaintiff was again

transferred out of SMU and this time assigned to A-Pod, and that is when Plaintiff alleges

**MEMORANDUM DECISION AND ORDER - 24**

he was first threatened by another inmate and requested protective custody. (Dkt. 103-4, p.6.) Defendants posit whether Plaintiff "made up the threat solely to be transferred away from a cell he did not want to move into." (Dkt. 101-2, p.10.)

After Plaintiff requested protective custody, Defendants contend that Plaintiff was disrespectful and refused to cooperate with Defendants Acosta and Doser when they interviewed him to get more details about the threat. (Dkt. 101-1, p.3.) The ICC Segregation Housing Placement Committee - comprised of Defendants Prado, Delaney and Chapman - heard testimony and reviewed the evidence and then denied Plaintiff's request for protective custody, which decision was approved by Defendant Valdez. (Dkt. 101-1, p.4.) The Committee determined that the evidence "failed to substantiate Plaintiff's allegation that he had been threatened or that he needed any additional protection." (*Id.*) Defendants also argue that Plaintiff's refusal to cooperate with Defendants and his lack of physical incidents while at ICC justified the Committee's decision to deny protective custody. (Dkt. 101-2, p.11.)

Finally, Defendants contend that in the three months preceding Plaintiff's assault, Plaintiff failed to provide Defendants with objective information for them to reasonably infer that he was incarcerated in conditions that posed a substantial risk of serious harm. *Id.* at 12. Defendants argue that the two concern forms Plaintiff allegedly submitted were nothing more than vague, uncorroborated allegations designed to have Plaintiff "transferred to a more comfortable cell or a paranoid response to some other inmate's

innocuous comments about [Plaintiff's] past." *Id*. at 13.

Many inferences can be drawn from the evidence presented thus far in this case, and such inferences must be drawn in a light most favorable to Plaintiff. *See T.W. Elec. Serv*., 809 F.2d at 630-31 (internal citation omitted). Not surprisingly, Plaintiff and Defendants disagree whether the facts show that Plaintiff was incarcerated under conditions that created a substantial risk of serious harm. However, the Court finds that the prison records submitted as evidence are both significant and persuasive in raising a triable issue of fact on whether Defendants possessed knowledge of a substantial risk of serious harm.

Other than his own allegations, Plaintiff has yet to properly submit evidence from other inmates supporting his contention that the ABC and JKL Pods at ICC were well known "Gladiator Pods" where gang members frequently threatened, extorted, and/or assaulted sex offenders. Nevertheless, Defendants produced the 67 inmate-on-inmate assault records, and, in the several records involving inmates who were assaulted because they were sex offenders, evidence exists for a trier of fact to determine whether Defendants were aware of the dangerous conditions for sex offender inmates in certain areas of the prison.

For instance, the report of a sex offender being assaulted on K-Pod in September 2006 turned out to be one inmate (a friend of the sex offender) pretending to assault the sex offender because a group of seven other inmates threatened to assault the sex offender

**MEMORANDUM DECISION AND ORDER - 26**

unless his friend "[took] care of business" for them. (Dkt. 101, Ex. A, ICC Hayes 2212.)

No injuries resulted from the fake assault, but the sex offender was relocated to GHI Pod

"where he said he would be safe." (*Id.*) The ICC investigator concluded the report by

stating: "I will continue to pursue information on other inmates who may be causing the

problems in K-Pod." (*Id.*) Furthermore, in the other records where inmates were assaulted

on A, K or L Pods due to their sex offender status, the ICC investigator reported the

following: "[The inmate] did state that he was assaulted in A-Pod because he was a sex

offender" (Dkt. 101, Ex. A, ICC Hayes 2262); the sex offender was told "he would have

to pay money every payday if he wanted to stay on [L-Pod.] [The sex offender] believed

that [the attacker] was working with [other] inmates . . . . This is not confirmed at this

time, but others have said they are extorting." (Dkt. 101, Ex. A, ICC Hayes 2429); a sex

offender on K-Pod reported "four inmates came into his cell, beat him, up, and [one of the

inmates] came in with a pillow case and filled it with his commissary. . . . [Two of the

attackers] received DOR's for their part in the Extortion and Assault." (Dkt. 101, Ex. A,

Hayes 2314-2315); and a sex offender on L-Pod reported that "He was confronted by

[another inmate] who told him he would have to pay rent or get out. When [the sex

offender] stated he would do neither one, [the attacker] then proceeded to hit [the sex

offender] in the face with his fists." (Dkt. 101, Ex. A, ICC Hayes 2850.)

  Another assault report describes an attack that took place in the dining hall in April

2006, a full year before Plaintiff's attack. The ICC investigator reported that it was the

**MEMORANDUM DECISION AND ORDER - 27**

third time the inmate had been attacked, and "is another case of inmates beating down other inmates because of their crime. All of the inmates involved with the assaults have been identified as Skinhead associates." (Dkt. 101, Ex. A, ICC Hayes 1411.) The ICC investigator further noted that the second and third assaults took place in the dining hall in front of everyone because "[i]t is obvious that the Aryan Knights are showing that they have "power" and nothing is going to deter them." *Id*. Although this report does not specifically identify the assaulted inmate as a sex offender, the language in the report reveals a general awareness of inmates being assaulted *because of* their crimes, and an awareness of gang members' alleged power and control among ICC inmates.

These assault records were all signed by Defendant Valdez or his designee. They also list the ICC employees who either witnessed, investigated and/or took steps to stop the attacks. Each report varies in its list of ICC employees but they are usually comprised of one or more correctional officers, sergeants, lieutenants, unit managers, counselors and medical personnel. It seems reasonable to assume, then, that ICC prison staff were generally aware of the risk of sex offender inmates being threatened and/or forced to "pay rent" and then attacked because of their sex offender status.

Defendants argue that the statistical evidence of these assault records does not support Plaintiff's argument that sex offenders were at a higher risk of being attacked on the ABC and JKL "Gladiator Pods." In addition, Defendants conclude that the lack of similar events in these assault reports imply that there are no facts that would permit a

**MEMORANDUM DECISION AND ORDER - 28**

reasonable factfinder to infer that the prisoner was incarcerated under conditions that posed a substantial risk of serious harm. The Court disagrees with these arguments, and finds that whether the number of sex offender assaults versus total number of inmate-on-inmate assaults is sufficient to support Plaintiff's allegation that sex offenders were at a higher risk of being attacked is an issue of fact for a jury to decide. And so is the materially factual issue of whether the assault reports describing attacks and/or threats of extortion on sex offender inmates can be considered "similar events" to Plaintiff's assault such that Defendants knew of the substantial risk of harm to Plaintiff.

The Court now turns to Defendants' other arguments that Plaintiff has not provided credible evidence to infer that Defendants knew that Plaintiff himself faced a substantial risk of serious harm. Defendants contend that Plaintiff's history of incarceration at ICC does not show that he was a vulnerable inmate because he alleged no threats the first three years of his incarceration, and that the seven months he lived on K-Pod before his assault were "mostly without incident." (Dkt. 101-2, p.10.) Although the first three years of Plaintiff's incarceration were free of threats or harm, that undisputed fact is not material to the outcome of this case. What is material, and at issue here, is whether Defendants knew of Plaintiff's substantial risk of serious harm beginning when Plaintiff alleges he was first threatened, and continuing throughout the next seven months until his assault occurred.  The Court's analysis and concern therefore begins in September 2006 when Plaintiff first alleged he was threatened because he was a sex

offender.

Plaintiff has submitted evidence to support his allegations that between September 2006 and April 2007, he was threatened four different times by different inmates on A or K-Pods because of his sex offender status. As to Plaintiff's first allegation of a threat of harm on September 29, 2006, which is the first day he was transferred to A-Pod, Defendants contend that his allegation is "at best, suspicious" and that Plaintiff "made up the threat solely to be transferred away from [another] cell he did not want to move into." (*Id.* at 10.) Plaintiff submitted a written request for protective custody at that time, so the Defendants interviewed Plaintiff wherein Defendants allege Plaintiff "became disrespectful, and argued that he was wrongfully convicted." (*Id.*) In contrast, Plaintiff alleges that Defendants Doser and Acosta asked Plaintiff: "Why should we put you in protective custody when you held down an underaged or a teenage girl and shot her up full of some unknown drugs and gave her Hepatitis C which is a uncureable diease that she will have for life?" (sic) (Dkt. 103-3, p.6.) Plaintiff further alleges that he responded to this accusation by stating: "I did not do what the State alleged I did. Besides, what does that have to do with my life, here, inside this institution, when I have told you that my well being is in jeopardy." (Dkt. 97-2, p.5.) This raises a genuine dispute of material fact.

The ICC Housing Placement Committee later conducted a hearing which unanimously denied Plaintiff's request for protective custody, and Defendants argue that this decision was "clearly reasonable" given Plaintiff's "lack of physical incidents while

**MEMORANDUM DECISION AND ORDER - 30**

at ICC and his refusal to cooperate with Defendants." (*Id.*) After the hearing, Plaintiff was transferred to K-Pod.

In January 2007, Plaintiff was transferred back to A-Pod but only two days passed before Plaintiff notified ICC staff both verbally and in writing that he had been threatened with violence and told to "leave this tier." (Dkts. 7-2, p.9, 97-2, pp.5-6.) In response, Defendants transferred Plaintiff back to K-Pod where he allegedly submitted two more written concern forms - one in March and one in April 2007 - explaining that he needed to move from K-Pod because he feared for his personal safety and other inmates were going to charge him rent because of his sex offender status. Defendants allege that they never received any of these three concern forms, and then argue that even if they were submitted,[12] they were "vague and uncorroborated allegations" that Plaintiff made so he could move to a "more comfortable cell or a paranoid response to some other inmate's innocuous comments about [Plaintiff's] past." (Dkt. 101-2, pp.12-13.)

Based on the evidence submitted by Plaintiff, Defendants have argued and concluded that a factfinder could not reasonably infer that Defendants possessed information that showed Plaintiff was at a substantial risk of serious harm. However, the inferences Defendants have drawn from Plaintiff's evidence clearly are *not* drawn in the light most favorable to Plaintiff, and that is the standard by which the Court must view the evidence for purposes of this summary judgment motion. Plaintiff alleges he was

---

[12]Indeed, Defendants "will assume that [Plaintiff] did file the [concern forms] with Defendants for purpose of this summary judgment motion only." (Dkt. 101-2, p.12 n.2.)

**MEMORANDUM DECISION AND ORDER - 31**

threatened four separate times in the seven-month period in which he was housed in two of the so-called "Gladiator Pods." Plaintiff further alleges he reported those threats both in writing and/or verbally to ICC staff, and even requested protective custody which was denied by the ICC Housing Placement Committee. Plaintiff has raised a genuine dispute of material fact as to Defendants Acosta and Doser's conduct and the substance of the protective custody interview with Plaintiff, which was a significant factor in the Committee's decision to deny protective custody. Additionally, Plaintiff's three other written concern forms are some of the most critical evidence submitted in this case, and understandably are the subject of great dispute between the parties. Therefore, a reasonable jury can decide whether the contents of the concern forms were nothing but "a paranoid response to some other inmate's innocuous comments about [Plaintiff's] past," or if those forms establish Defendants' awareness of a substantial risk of harm to Plaintiff.

Coupled with the evidence of other similar attacks on sex offenders contained in the inmate-on-inmate assault reports, Plaintiff has submitted sufficient evidence upon which a reasonable jury could conclude that the risk of harm to Plaintiff was substantial. Accordingly, the Court finds that this evidence satisfies the objective prong of Plaintiff's Eighth Amendment failure to protect claims for purposes of summary judgment.

**MEMORANDUM DECISION AND ORDER - 32**

(2)    Subjective Requirement - Deliberate Indifference

Moving to the subjective prong of the analysis, the Court reiterates the summary judgment standard that all reasonable inferences must be taken in the light most favorable to Plaintiff. To prevail on his Eighth Amendment claims, Plaintiff must also demonstrate that the prison official(s) were "deliberately indifferent" to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. The evidence must show that Defendants have more than a mere suspicion that an attack will occur, but less than a moral certainty that one inmate intends to attack another inmate at a specific time and place. *Berg*, 794 F.2d at 459. Prison officials may not "ignore obvious dangers to inmates," but "may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to a known risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 826.

As discussed above, Plaintiff's evidence includes four specific instances of threats of harm and/or extortion against him in a seven-month period, all of which are supported by written and testimonial evidence in the record. Plaintiff also makes broad allegations of the overall conditions at ICC and the Defendants' alleged misconduct, such as Defendants' "fail[ure] to adequately investigate assaults . . . refus[al] to protect prisoners who request and need protection from assault" and that ICC is an "extremely violent prison" known as "gladiator school" (Dkt. 103-3, pp.9-10), but these broad allegations are largely unsupported by the evidence submitted thus far in the case.

**MEMORANDUM DECISION AND ORDER - 33**

In contrast, Defendants argue that "the record is replete with evidence" that Plaintiff failed to justify his requests to be placed in protective custody or be transferred. (Dkt. 101-2, p.13.) Defendants contend that Plaintiff's prior behavioral history at ICC "undermined his credibility in the eyes of ICC staff and made it difficult to decipher when [Plaintiff] had legitimate concerns." (*Id.* at 14.)[13] Defendants also reiterate their contention that Plaintiff's written concern forms were too vague and uncorroborated to satisfy the deliberate indifference standard, though Defendants readily acknowledge that Plaintiff's verbal communication to ICC staff about another threat against him in January 2007– to "leave this tier"– resulted in "ICC staff subjectively believ[ing] that there was a substantial risk of serious harm and acted accordingly" by immediately transferring him to another Pod. (*Id.* at 15.)

Regarding the denial of protective custody, Defendants argue that Plaintiff has not alleged any specific facts indicating that the members of the Housing Placement Committee–Defendants Prado, Delaney, Chapman–and Defendant Warden Valdez had a subjective belief that Plaintiff himself faced a substantial risk of serious harm. Defendants maintain that the evidence presented to the Committee, along with Plaintiff's failure to cooperate in the interview with Defendants Acosta and Doser, resulted in there not being enough facts to substantiate a risk of serious harm that warranted additional protection.

---

[13]Plaintiff was disciplined four separate times by ICC staff – twice for using aggressive language toward an ICC staff member, once for hiding a razor blade in his cell, and once for refusing to move into a new cell. (Dkt. 101-2, p.14.)

**MEMORANDUM DECISION AND ORDER - 34**

Defendants' final argument is that the subjective component cannot be met because they reasonably responded to all of Plaintiff's threats, even though "the harm ultimately was not averted." *See Farmer*, 511 U.S. at 826. Defendants claim that because they followed the procedural rules regarding a protective custody request, they reasonably responded to Plaintiff's initial threat of harm, even though they ultimately denied him protective custody. (Dkt. 101-2, pp.16-17.) Defendants also contend that they reasonably responded to Plaintiff's second threat of harm when they transferred him from A-Pod to K-Pod, and that they were reasonable in doing nothing in response to Plaintiff's final two concern forms because they would have been unable to determine the identity of the inmate who threatened Plaintiff, or "whether there was a legitimate threat at all." (*Id.* at 17-18.)

As to Defendants Acosta and Doser, the Court disagrees with Defendants' contradictory arguments. On the one hand, Defendants argue that the two concern forms allegedly submitted in March and April 2007 (one to Defendant Acosta, and the other to Defendant Doser) are "too vague and uncorroborated" to establish deliberate indifference because Plaintiff did not mention a specific inmate, a specific date, or a specific threat of harm against him. But in September 2006, when Plaintiff informed Defendants of the first threat against him and specifically named inmate "Pierce" and described him as a bald man with two teardrop tattoos on his face below one eye, Defendants seem to ignore or set aside the specifics of this alleged threat. Instead, they summarily assert there wasn't

**MEMORANDUM DECISION AND ORDER - 35**

enough evidence to establish a substantial risk of serious harm primarily due to Plaintiff's alleged uncooperative and disrespectful behavior in the interview conducted by Defendants Acosta and Doser. But then Defendants unexpectedly admit that Plaintiff's January 2007 verbal notice to ICC staff of being ordered to move off A-Pod by other inmates – without specifically mentioning any names, dates or specific threats of harm – was sufficient notice of "specific, imminent threats against [Plaintiff's] personal safety" for Defendants to *subjectively* believe there was substantial risk of serious harm. (*Id.* at 15.)

The Court finds, that after reasonably construing all of the evidence in Plaintiff's favor, genuine issues of material fact exist as to whether Defendants Acosta and Doser were deliberately indifferent to Plaintiff's substantial risk of harm, and whether they responded reasonably to that known risk. Plaintiff notified ICC prison staff four different times about alleged threats of harm against him in a seven-month period. Defendants' admission that the January 2007 verbal notification resulted in the Defendants' subjectively believing that Plaintiff was at a serious risk of harm further suggests that the other three written notices did so as well. And those other three written notifications directly involved Defendants Acosta and Doser, each of whom recommended denial of protective custody in September 2006, and then provided no response or investigation into Plaintiff's final two concern forms which he allegedly filed just weeks before the assault. As already noted above in the objective component analysis, there are disputed

**MEMORANDUM DECISION AND ORDER - 36**

material factual issues as to Defendants Acosta and Doser's conduct and the substance of the protective custody interview with Plaintiff, which seems to have been a significant factor in the Committee's decision to deny protective custody. There are a number of other genuine factual disputes regarding the final two concern forms as well – whether Defendants actually received them, whether the information contained in those concern forms established a substantial risk of serious harm, and whether Defendants' response to the concern forms (or lack thereof) was reasonable.

Accordingly, the evidence presented herein and the inferences drawn therefrom do not eliminate factual disputes such that summary judgment can be granted for Defendants Acosta and Doser. Plaintiff has satisfied the objective and subjective prongs of his Eighth Amendment claims so that there are triable issues of fact for a jury to determine whether Defendants Acosta and Doser failed to protect Plaintiff under the Eighth Amendment. The Court therefore denies Defendants' Motion for Summary Judgment as to Defendants Acosta and Doser.

As to Defendants Prado, Delaney, Chapman, and Valdez, the Court finds that it is without sufficient factual information on the subjective component of the *Farmer v. Brennon* test to determine whether they are entitled to summary judgment on the failure-to-protect claim. Therefore, the Court will currently deny the Motion for Summary Judgment as to these Defendants without prejudice, but will permit Defendants to decide whether they wish to supplement and re-assert their Motion or proceed to trial.

**MEMORANDUM DECISION AND ORDER - 37**

The 2010 amendments to Federal Rule of Civil Procedure 56 broaden the Court's authority both to seek additional factual development from the parties and to craft summary judgment orders tailored to the circumstances of the case. If Defendants choose to re-assert their Motion for Summary Judgment, they can submit supplemental briefing and submission of exhibits only.

Keeping in mind that Defendants bear the burden of demonstrating the absence of a genuine dispute as to the subject component of a deliberate indifference claim, the Court finds that the parties have suggested, but not sufficiently addressed what transpired during the investigation of and hearing for Plaintiff's request for protective custody, and whether Defendants Prado, Delaney, Chapman and Valdez had any further oversight, notice, or review of Plaintiff's housing assignments, and/or his alleged verbal and written concern forms of threats of harm, following their denial of Plaintiff's request for protective custody in September 2006. Either party or both parties may wish to provide additional facts to address the following:

1. Paperwork related to Plaintiff's request for protective custody indicates that Plaintiff resided in SMU "until [protective custody] investigation is complete" (Dkt. 101-11, p.6.) Besides the interview with Defendants Acosta and Doser, it would be helpful to know what evidence was gathered, considered or reviewed during this investigation process, and whether the investigation involves any type of follow-up to ascertain the

validity of Plaintiff's allegations, such as whether any of the Defendants attempted to interview or follow-up with inmate "Pierce" who Plaintiff identified as the one who threatened him.

2.      During the protective custody hearing, the Housing Placement Committee "consider[ed] all the testimony and evidence" (Dkt. 101-2, p.11), but it is unclear whether the evidence consisted of anything more than the report dated October 5, 2006, by Defendant Doser that summarized his and Defendant Acosta's interview with Plaintiff.  It would also be helpful to have additional facts and details regarding Plaintiff's testimony during the hearing.

3.      Following the Housing Placement Committee's denial of Plaintiff's request for protective custody, it is unclear whether Defendants Prado, Delaney, Chapman or Valdez had any further oversight, notice or review of Plaintiff's housing assignments, and/or his other three alleged verbal and written concern forms of threats of harm. Either party may submit additional factual information to confirm or deny any or all of these Defendants' ongoing involvement with or knowledge of Plaintiff's risk of harm between October 2006 and April 2007.

### D.     *Discussion of All Claims Against Defendants CCA and John Ferguson*

As to Defendants CCA and John Ferguson (the CEO of CCA), the Court has

thoroughly reviewed the record and finds that Plaintiff has failed to establish the requisite

proximate causation for either of these Defendants to be liable under § 1983. *See Taylor*,

880 F.2d at 1045. Defendant CCA cannot be held liable under a theory of respondeat

superior,[14] *see id.,* nor has Plaintiff sufficiently alleged that CCA executed an official

policy or unofficial custom which inflicted the injury of which Plaintiff complains. *See*

*Monell*, 436 U.S. at 694. Plaintiff makes one conclusory allegation in the First Amended

Complaint that CCA, Defendants, and other ICC staff "have failed to and continue to

improperly protect the health and safety of offenders by their policies and procedures and

are only feeding one class of offenders to the wolves in their den as if they were raw

meat." (Dkt. 7, p.15.) This singular, generalized allegation–without any other information

describing which specific CCA policy or procedure amounted to deliberate indifference

and how it was the moving force behind his alleged Eighth Amendment violation–is

nothing more than the "threadbare recital" of the elements of a cause of action "supported

by mere conclusory statements" that the *Iqbal* Court rejected for not satisfying the

pleading standard set forth in Federal Rule of Civil Procedure 8(a). *See Iqbal*, 556 U.S. at

---

[14]In *Lonoaea v. Corrections Corp. Of America*, 665 F.Supp.2d 677 (N.D. Miss. 2009), the district court recognized that CCA is a private corporation that contracts with the state to run its prisons, so the corporation and its employees is a "state actor" subject to a suit under § 1983. *Id.* at 685-686. However, "just as a municipal corporation is not vicariously liable upon a theory of respondeat superior for constitutional torts of its employees, so is a private corporation not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Id. (*citation omitted).

**MEMORANDUM DECISION AND ORDER - 40**

678. This Court does so as well.

As to Defendant John Ferguson, Plaintiff has not made any specific allegations or produced any evidence that Defendant Ferguson directly participated in or directed the violation of Plaintiff's Eighth Amendment rights, or that Defendant Ferguson had any knowledge that Plaintiff was in danger because of the culpable acts of Ferguson's subordinates. Defendant Ferguson is the CEO of CCA and resides in Tennessee. Plaintiff has not established sufficient causal connection between this Defendant and the constitutional violations Plaintiff suffered while incarcerated here in Idaho. *See Hydrick v. Hunter*, 669 F.3d 937, 941-942 (9th Cir. 2012) (conclusory allegations and generalities in plaintiffs' complaint are insufficient to establish defendants' individual liability for money damages); *cf. Starr*, 652 F.3d at 1209 (plaintiff pleaded sufficient facts to plausibly suggest the sheriff had knowledge of and acquiesced in the unconstitutional conduct of his subordinates; there were many allegations in the complaint detailing what the sheriff knew or should have known, and what he did or failed to do.) Accordingly, the Court grants judgment as a matter of law in favor of Defendants CCA and John Ferguson.

**E.    Discussion of Defendants' Argument that Plaintiff's Injuries Are De Minimis**

Defendants' final argument for summary judgment involves the severity of physical injuries that Plaintiff suffered as a result of the assault. Under the Prison Litigation Reform Act, an inmate cannot recover mental or emotional damages if the underlying physical injury is only de minimis. *See* 42 U.S.C. § 1997e(e) (prisoner may

**MEMORANDUM DECISION AND ORDER - 41**

not bring a federal civil action for mental or emotional injuries suffered while in custody without a prior showing of physical injury); *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002) (all 42 U.S.C. § 1997e(e) claims require a prior showing of physical injury that need not be significant but most be more than de minimis).

ICC medical staff treated Plaintiff immediately after the assault, and one of the nurses who examined him summarized his injuries as "multiple areas of mild redness at various ... sites on his body. The worst of his injuries was an area of mild edema & bruising to [left]side of his face." (Dkt. 101-1, p.6.) Defendants contend that based on that nurse's written summary, Plaintiff's injuries were de minimis and therefore Plaintiff may not recover mental or emotional damages.

Plaintiff, however, disputes this conclusion and argues that the assault report indicates Plaintiff was knocked "down to the floor and kick[ed] [by the attacker] continually until he appeared to go unconscious", that Plaintiff required immediate medical treatment due to the severity of his injuries resulting from the assault, and that he was prescribed a variety of pain medications two weeks after the assault for ongoing pain and swelling. Based on these conflicting arguments and the evidence submitted in this case, the Court finds that triable issues of material fact exist as to whether Plaintiff's injuries are more than de minimis or not. *See, e.g., Evans v. Alameida*, 2006 WL 618298 *10 (E.D. Cal. 2006) (abrasions to plaintiff's wrists from handcuffs applied by defendants could support an award of emotional distress damages, which is a question of fact that

**MEMORANDUM DECISION AND ORDER - 42**

cannot be resolved on summary judgment). Accordingly, Defendants' motion for summary judgment as to the severity of Plaintiff's injuries is denied.

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND

Plaintiff seeks leave to amend the First Amended Complaint because in the course of discovery he learned the identity of the "Jane Doe" member of the Housing Placement Committee and now wishes to include her as a defendant in this case. Plaintiff also seeks to include additional documentary evidence related to his dental bridge that was allegedly damaged during his assault.

### 1.    Standard of Law

A pro se litigant bringing a civil rights suit must have an opportunity to amend the complaint to overcome deficiencies unless it is clear that they cannot be overcome by amendment. *See Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000). Federal Rule of Civil Procedure 15(a) provides that leave to amend should be "freely given."

In the court's discretion, whether leave to amend should be granted is generally determined by considering the following factors: (1) undue delay; (2) bad faith or dilatory motive; (3) futility of amendment; (4) prejudice to the opposing party; and (5) whether the plaintiff previously amended the complaint. *United States v. Corinthian Colleges*, 655 F.3d 984; 995 (9th Cir. 2011); *In re Rogstad*, 126 F.3d 1224, 1228 (9th Cir. 1997).

Generally, delay alone is insufficient reason to deny a motion to amend. *United States v. Webb*, 655 F.2d 977 (9th Cir. 1981). However, in some circumstances it is not an

abuse of discretion to deny a motion to amend where the case has advanced too far on the merits. *Roberts v. Arizona Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981) (amendment denied as prejudicial where offered "at the eleventh hour," after discovery nearly completed and summary judgment motion was pending); *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1492 (9th Cir. 1983) (denying leave to amend after the filing of summary judgment motion where there were no new facts discovered and possible disposition would be unduly delayed); *Lopez v. General Motors Corp.*, 697 F.2d 1328, 1332 (9th Cir. 1983) (denying leave to amend to add additional parties six months after removal and four days prior to hearing on summary judgment motion).

### 2.    Discussion

Plaintiff initiated this legal action on March 16, 2009, and filed his First Amended Complaint on November 9, 2009. Since that time, numerous pretrial motions and discovery disputes were filed and resolved by the parties. Pursuant to the Court's Order dated January 30, 2012, discovery was finally completed and Defendants' Second Motion for Summary Judgment was filed on March 29, 2012. (Dkt. 90.) On June 19, 2012, Plaintiff filed his Motion for Leave to Amend. Defendants assert that Plaintiff's Motion for Leave to Amend is both improper and prejudicial and therefore should be denied.

As to the impropriety of Plaintiff's Motion for Leave to Amend, Defendants argue that the applicable Local Civil Rule requires a party moving to amend a pleading to

"reproduce the entire pleading as amended" at the time of the filing of the motion. *See* Dist. Idaho Loc. Civ. R. 15.1. Because Plaintiff filed only the Motion for Leave to Amend without including the entire complaint as amended, Defendants contend that Plaintiff's Motion is improper. While the Court acknowledges that such language is in Local Civil Rule 15.1, that Rule also provides: "Failure to comply with this rule is not grounds for denial of the motion." *Id.* In addition, Plaintiff is a pro se litigant and the Ninth Circuit has noted frequently the rule favoring liberality in amendments to pleadings for pro se litigants. *Lopez v. Smith,* 203 F.3d at 1131. Accordingly, Plaintiff's Motion for Leave to Amend will not be denied on the procedural basis that it was improperly filed by Plaintiff.

Defendants' second objection to the Motion for Leave to Amend is that it would be prejudicial to Defendants' case now that discovery is long completed and they have a pending motion for summary judgment. Defendants argue that the addition of new parties and claims would likely require the reopening of discovery and substantially delay the forward progress of this case. The Court agrees that Plaintiff's request to include additional documentary evidence related to his damaged dental bridge–without specifying which claim or claims would then be alleged to justify the inclusion of this evidence–would cause undue delay and prejudice to the Defendants at this point in the proceedings. Plaintiff did not incorporate his damaged dental bridge in the First Amended Complaint, either as a separate claim for relief or as part of his claim for damages arising from the assault, which presumably is why he is seeking to amend the Complaint now.

**MEMORANDUM DECISION AND ORDER - 45**

But this is not the first time Plaintiff has raised the issue of his damaged dental bridge. He has done so in other pretrial motions and pleadings in this case, including Plaintiff's Motion for Leave of Court to File First Supplemental Civil Rights Complaint (Dkt. 54), but the Court has previously denied the applicable motion or mooted the pleading. (*See* Dkts. 69, 70.) Plaintiff also raises the damaged dental bridge as a disputed factual issue in his contemporaneous Memorandum in Opposition to CCA/ICC Defendants' Second Motion for Summary Judgment. (Dkt. 103-5, pp.8-15.)

If Plaintiff prevails on his failure-to-protect claim against one or more of the Defendants, he will have the opportunity to include his allegedly damaged dental bridge as part of the damages arising from the assault. But he may not amend the Complaint at this point in the proceedings–where discovery is complete and a motion for summary judgment is pending– to include a separate claim or claims for relief regarding the dental bridge, such as a claim for inadequate dental care. Plaintiff has already tried to do so once before (without success), and once again the Court finds that such amendment would cause undue delay and prejudice the Defendants. The Court therefore denies Plaintiff's Motion for Leave to Amend to the extent that he wishes to include a separate claim regarding his damaged dental bridge.

As to Plaintiff's request to amend the First Amended Complaint to add April Chapman as a Defendant, the Court finds this request to be proper under the present circumstances and in accordance with the Ninth Circuit favoring liberality in amendments

**MEMORANDUM DECISION AND ORDER - 46**

to pleadings for pro se litigants. *See Lopez v. Smith,* 203 F.3d at 1131. Contrary to

Defendants' argument that April Chapman is a "new" defendant that would somehow

prejudice the Defendants, Plaintiff is not really adding a "new" defendant to the action.

Rather, Plaintiff is merely amending the First Amended Complaint to provide the real

name for an individual previously identified as a "John/Jane Doe" defendant. *See, e.g.,*

*McCain v. California Highway Patrol*, 2012 WL 1554926 *2 (E.D. Cal. 2012) (district

court granted plaintiff's motion to amend complaint to provide the actual name of an

individual previously identified as a "Jane Doe" defendant). Plaintiff only recently

learned of April Chapman's actual name through discovery, but Defendants and

Defendants' counsel were well aware that April Chapman was a member of the Housing

Placement Committee throughout this litigation. In fact, Defendants have already

submitted the Affidavit of April Chapman in this case (Dkt. 101-5), wherein she admits to

being the third member of the Housing Placement Committee that denied Plaintiff

protective custody. For these reasons, the Court grants Plaintiff's Motion for Leave to

Amend to name April Chapman as a defendant in the First Amended Complaint.

Counsel for Defendants may waive service of process for April Chapman and file

an answer on her behalf, or may file a notice of appearance and a notice that she will join

the present answer filed by the other Defendants.

**MEMORANDUM DECISION AND ORDER - 47**

## OTHER PENDING MOTIONS

### 1.      Plaintiff's Motion for Trial Date (Dkt. 91)

Plaintiff's Motion for Trial Date is hereby granted as to the remaining defendants and claims. A five-day jury trial will be held beginning on January 7, 2013, at 1:30 p.m.

### 2.      Plaintiff's Motion for Res Judicata, Collateral Estoppel and/or Issue Preclusion (Dkt. 92)

Plaintiff filed a Motion for Res Judicata Collateral Estoppel and/or Issue Preclusion in an attempt to prevent Defendants from filing their Second Motion for Summary Judgment. Plaintiff argues that Defendants' three previous motions for summary judgment have already been decided in this case, and relies upon the doctrines of res judicata and collateral estoppel to support his argument. (Dkt. 92, p.2.)

Plaintiff's allegations are not supported by the record, and his reliance upon the doctrines of res judicata and collateral estoppel is erroneous.  He is also mistaken in his assertion that Defendants' previous motion for summary judgment *in this case* has already been litigated and decided. "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigation of the issue in another lawsuit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citations omitted).

Here, the Court denied Defendants' initial Motion for Summary Judgment (Dkt.

40) in its Memorandum Decision and Order dated September 7, 2011, because discovery

was not complete. (Dkt. 69, p.12.) The Court specified that its ruling "is without prejudice

to the ICC Defendants' re-filing a summary judgment motion." *Id.* Clearly there has been

no "final judgment on the merits" in this action that bars Defendants from filing their

Second Motion for Summary Judgment. Nor is the doctrine of collateral estoppel an

appropriate basis for relief. First, the Court has not previously decided "an issue of fact or

law necessary to its judgment" in this case, and, second, Defendants are not attempting to

re-litigate such an issue "in another lawsuit." *See Allen*, 449 U.S. at 94. Defendants are

simply refiling their motion for summary judgment pursuant to this Court's previous

Order. Accordingly, Plaintiff's Motion for Res Judicata Collateral Estoppel and/or Issue

Preclusion is denied.

### 3.   Motion for Subpoena Time Enlargement and Motion for Subpoenas Duces Tecum (Dkts. 95, 97)

On February 3, 2012, Plaintiff filed a Motion for Subpoena Time Enlargement

(Dkt. 95) and a Motion for Subpoenas Duces Tecum. (Dkt. 97.) The Motion for Subpoena

Time Enlargement referenced discovery deadlines set forth in the Court's Scheduling

Order dated February 11, 2010 (Dkt. 14), and requested an additional 30 days "to make

reasonable requests for subpoenas duces tecum." (Dkt. 95.) Defendants filed a Non-

Opposition to Plaintiff's Motion for Subpoena Time Enlargement (Dkt. 99), and correctly

noted that all of the dates in the February 11, 2010 Scheduling Order had long since

expired. Because Plaintiff filed his applicable Motion for Subpoena Duces Tecum (Dkt.

97) prior to the updated discovery deadline of February 29, 2012 (*see* Dkt. 90), the

Motion for Subpoena Time Enlargement is deemed moot.

In the Motion for Subpoenas Duces Tecum, Plaintiff seeks the Court's permission

to issue subpoenas duces tecum on five prison employees who allegedly "possess direct

knowledge" of Plaintiff's assault, know of the other inmate-on-inmate assaults that

occurred at ICC, or know about some of the injuries Plaintiff suffered in the assault. (Dkt.

97, pp. 2-6.) Plaintiff also seeks permission to issue subpoenas on three ICC inmates who

have general knowledge of the sex offender assaults that occurred on JKL Pods in 2007

or were victims of an assault themselves, or both. (*Id.* at pp.6-8.) Finally, Plaintiff

attaches copies of six affidavits of alleged victims of assault at ICC (including himself)

that occurred on JKL Pods in 2007. (*Id.* at p.9.)

Pursuant to the Federal Rules of Civil Procedure, a subpoena duces tecum is a

discovery tool used to direct a non-party to produce documents or other tangible objects

for inspection. Fed. R. Civ. P. 45(a)(2)(C). To the extent that Plaintiff seeks additional

written discovery materials from ICC through these subpoenas, the Motion will be

denied, because discovery has long since passed. To the extent that Plaintiff seeks to

subpoena these individuals for trial, he may re-file his Motion pursuant to Federal Rule of

Civil Procedure 45 when  he receives the trial-setting order in this case. To the extent that

Plaintiff seeks to have these individuals bring records or documents into court that

Plaintiff could have subpoenaed earlier in this case while the discovery period was open,

**MEMORANDUM DECISION AND ORDER - 50**

Defendants are free to assert a failure-to-disclose bar for such records or documents.

**4.      Defendants' Motion to Strike (Dkt. 100)**

Pursuant to Federal Rule of Civil Procedure 12(f), Defendants seek to strike the affidavits of five ICC inmates that Plaintiff filed in support of his Motion for Subpoenas Duces Tecum. (Dkt. 100-1, p.2.) Defendants argue that the affidavits are not relevant in this matter and thus would not be admissible at trial.

The court has reviewed the contents of the affidavits and determined the testimony therein is not needed for its ruling on Defendants' Amended Second Motion for Summary Judgment. Other evidence in the record sufficiently supports the Court's ruling on that motion. Defendants' Motion to Strike is therefore deemed moot. To the extent Plaintiff wishes to use some or all of the contents of these affidavits at trial, Plaintiff may call the respective affiants as witnesses at trial to testify as to the content of their affidavits, and Defendants are free to object to the relevance or admissibility of such evidence at that time. *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (affiants' personal knowledge and competency to testify may be inferred from the affidavits themselves) (citation omitted).

## ORDER

**IT IS ORDERED**:

1.      Defendants' Amended Second Motion for Summary Judgment (Dkt. 101) is

**GRANTED in part** and **DENIED in part**.

      A.      All claims of the First Amended Complaint against CCA and John

Ferguson are dismissed with prejudice.[15]

      B.      Claims 1, 4, 5, and 6 of the First Amended Complaint are dismissed

with prejudice.

      C.      Claims 2, 3, and 7 of the First Amended Complaint (failure to protect

claims) as to Defendants Acosta and Doser will proceed to trial.

      D.      Claims 2, 3, and 7 of the First Amended Complaint (failure to protect

claims) as to Defendants Prado, Delaney, Chapman, and Valdez will

proceed to trial, unless these Defendants file a supplement to the

pending Motion for Summary Judgment.

2.      Defendants may file supplemental briefing and exhibits to reassert their

entitlement to summary judgment no later than 30 days after entry of this

Order. If they do so, Plaintiff may file a supplemental response and exhibits

within 15 days after receipt of Defendants' filing, and Defendants may file

a reply within 15 days thereafter.

---

[15]Plaintiff is advised that a notice of appeal on any dismissed claims is not appropriate until all claims are concluded after trial.

3.      Plaintiff's Motion for Leave of Court to File Second Amended Civil Rights Complaint Pursuant to F.R.C.P. Rule 15.A (Dkt. 109) is **GRANTED in part** and **DENIED in part**.

    A.      April Chapman is substituted as the Jane Doe on the Housing Placement Committee in the First Amended Complaint.

    B.      The Clerk of Court is directed to issue a waiver of summons of service to Defendants' attorney for April Chapman.

    C.      Counsel for Defendants may waive service of process for April Chapman and file an answer on her behalf, may file a notice of appearance and a notice that she will join the present answer filed by the other Defendants, or may file a notice of non-representation.

4.      Plaintiff's Motion for Trial Date (Dkt. 91) is **GRANTED**, as to the remaining defendants and claims. A five-day jury trial will be held beginning on **January 7, 2013, at 1:30 p.m.**

5.       Plaintiff's Motion for Res Judicata Collateral Estoppel and/or Issue Preclusion (Dkt. 92) is **DENIED**.

6.      Plaintiff's Motion for Subpoena Time Enlargement (Dkt. 95) is **MOOT**.

7.      Plaintiff's Motion for Subpoenas Duces Tecum (Dkt. 97) is **DENIED, as set forth above.**

**MEMORANDUM DECISION AND ORDER - 53**

8.      Defendants' Motion to Strike Affidavits of Larry Sittner, Brandon Jordan,

Todd Butters, Phillip Fenwick, and Albert Veenstra Filed in Support of

Plaintiff's Motion for Subpoenas Duces Tecum (Dkt. 100) is **MOOT**.

DATED:  **September 28, 2012**



Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 54**